**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

**TYEASHA JOHNSON, on behalf of herself**
**and others similarly situated,**

        **Plaintiff,**

**v.**

        **CASE NO. 4:20-cv-00574-SPM**

**HIMAGINE SOLUTIONS, INC.,**

        **Defendant.**

## UNOPPOSED MOTION TO APPROVE SETTLEMENT OF FLSA COLLECTIVE ACTION

Respectfully submitted, January 21, 2021

        **SHAVITZ LAW GROUP, P.A.**

        */s/ Alan Quiles*
        Gregg I. Shavitz *pro hac vice*
        Alan L. Quiles *pro hac vice*
        951 Yamato Road, Suite 285
        Boca Raton, FL 33431
        Tel: (561) 447-8888
        Fax: (561) 447-8831
        gshavitz@shavitzlaw.com
        aquiles@shavitzlaw.com

        **STUEVE SIEGEL HANSON LLP**

        George A. Hanson, Mo. 43450
        Alexander T. Ricke, Mo. 65132
        460 Nichols Rd, Suite 200
        Kansas City, MO 64112
        Tel: (816) 714-7100
        Fax: (816) 714-7101
        hanson@stuevesiegel.com
        ricke@stuevesiegel.com

        ***Attorneys for Plaintiff and the***
        ***Putative Collective***

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... iii

INTRODUCTION ................................................................................................ 1

PROCEDURAL HISTORY OF THE LITIGATION ............................................... 2

SUMMARY OF SETTLEMENT TERMS.............................................................. 4

      I.      Notice of Settlement and Calculation and Distribution of Settlement Shares....... 4

      II.     Class Representative Payment and Service Payments................................ 6

      III.    Release.................................................................................................. 7

      IV.    Attorneys' Fees and Costs.......................................................................... 8

      V.     Administration Costs.................................................................................. 8

ARGUMENT ....................................................................................................... 9

      I.      The Court Should Approve All Aspects of the Parties' Proposed FLSA Collective Action Settlement............................................................................................ 9

      A.     For Settlement Purposes, the Case Should be Certified as an FLSA Collective Action Because the Settlement Collective Is Comprised of Similarly Situated Employees......... 9

      B.     The Parties' FLSA Settlement Reflects a Fair and Equitable Resolution of a Bona Fide Dispute.............................................................................................. 12

           1.     The Litigation Involves a Bona Fide Dispute............................... 12

           2.     The Proposed Settlement Is Fair and Equitable....................................... 13

      C.     The Proposed Class Representative and Service Payments Are Reasonable and Warranted.................................................................................... 19

      D.     The Parties' Proposed Notice and Plan for Distribution and Settlement Administration Are Fair, Adequate and Reasonable. ........................................... 22

      E.     The Court Should Approve the Parties' Negotiated Agreement that Plaintiffs' Counsel Receive as a Reasonable Attorney's Fee One-Third (33.3%) of the Common Fund Recovered for the Benefit of the FLSA Settlement Collective, Plus Reimbursement of Their Stipulated Litigation Costs. ................ 24

i

1.  A Reasonable Attorney's Fees Using the "Percentage of the Benefit" Approach. ...................................................................................25

2.  Other Relevant Factors Support the Award of Attorney's Fees. ...............27

3.  A Lodestar Cross-Check Here Results in a "Negative Multiplier" Supporting the Award of Attorney's Fees. .................................................28

CONCLUSION ........................................................................................................30

CERTIFICATE OF SERVICE ................................................................................30

# TABLE OF AUTHORITIES

**Cases**

*Astarita v. Menard, Inc.*,
   2018 WL 7048693 (W.D. Mo. Dec. 7, 2018) ........................................................ 11

*Barbee v. Big River Steel, LLC*,
   927 F.3d 1024 (8th Cir. 2019) ................................................................ 12, 24

*Barfield v. Sho-Me Power Elec. Co-op.*,
   2015 WL 3460346 (W.D. Mo. June 1, 2015) ........................................................ 26

*Bellinghausen v. Tractor Supply Co.*,
   306 F.R.D. 245 (N.D. Cal. 2015) ................................................................ 20

*Boland v. Baue Funeral Home Co.*,
   2015 WL 7300507 (E.D. Mo. Nov. 18, 2015) ........................................................ 12

*Brown v. Reddy ICE Corp.*,
   2016 WL 2930933 (E.D. Mo. May 19, 2016) ........................................................ 11

*Caligiuri v. Symantec Corp.*,
   855 F.3d 860 (8th Cir. 2017) .......................................................... 20, 21, 25, 29

*Carillo v. Dandan Inc.*,
   51 F. Supp. 3d 124 (D.D.C. 2014) ................................................................ 14

*Excel Energy, Inc., Sec., Derivative & ERISA Litig.*,
   364 F. Supp. 2d 980 (D. Minn. 2005) ........................................................ 26

*Garcia v. Tyson Foods, Inc., No. 06-2198-JTM*,
   2012 WL 5985561 (D. Kan. Nov. 29, 2012) ...................................................... 16, 28

*Halleen v Belk, No. 4:16-CV-00055-ALM*,
   2018 U.S. Dist. LEXIS 214015 (E.D. Tex. Dec. 20, 2018) ................................................ 28

*Hensley v. Eckerhart*,
   461 U.S. 424 (1983) .......................................................... 24, 26, 27

*Hill v. World Wide Tech. Holding Co.*,
   2012 WL 5285927 (E.D. Mo. Oct. 25, 2012) ........................................................ 22

*Huyer v. Buckley*,
   849 F.3d 395 (8th Cir. 2017) .......................................................... 25, 29

*Johnson v. Thomson Reuters*,
    2019 WL 1254565 (D. Minn. Mar. 19, 2019) ..................................................... 12

*Jones v. Synergies3 Tec Services*,
    2018 WL 6727061 (E.D. Mo. Dec. 21, 2018) ...................................................... 12

*Kautsch v. Premier Commc'ns*,
    504 F. Supp. 2d 685 (W.D. Mo. 2007) ............................................................... 11

*Keil v. Lopez*,
    862 F.3d 685 (8th Cir. 2017) ..................................................................... 27, 29

*King v. Raineri Constr., LLC*,
    2015 WL 631253 (E.D. Mo. Feb. 12, 2015) .................................................. 14, 15

*Matheson v. T-Bone Rest., LLC*,
    2011 WL 6268216 (S.D.N.Y. Dec. 13, 2011) ............................................... 22, 25

*Melgar v. OK Foods*,
    902 F.3d 775 (8th Cir. 2018) ............................................................... 12, 14, 26

*Meller v. Bank of the West*,
    2018 WL 5305562 (S.D. Iowa Sept. 10, 2018) .................................. 12, 14-15, 25

*Nelson v. Wal-Mart Stores, Inc.*,
    2009 WL 2486888 (E.D. Ark. Aug. 12, 2009) ...................................................... 29

*Netzel v. West Shore Group, Inc.*,
    2017 WL 1906955 (D. Minn. May 8, 2017) ....................................................... 25

*Petrovic v. Amoco Oil Co.*,
    200 F.3d 1140 (8th Cir. 1999) .......................................................................... 14

*Sanderson v. Unilever Supply Chain, Inc.*,
    2011 WL 5822413 (W.D. Mo. Nov. 16, 2011) ............................................... 9-10

*Sanderson v. Unilever Supply Chain, Inc.*,
    2011 WL 6369395 (W.D. Mo. Dec. 19, 2011) ..................................................... 26

*Shackleford v. Cargill Meat Sols. Corp.*,
    2013 WL 937550 (W.D. Mo. Mar. 8, 2013) ....................................................... 26

*Shackleford v. Cargill Meat Solutions Corp.*,
    2013 WL 209052 (W.D. Mo. Jan. 17, 2013) ................................................. 11, 12

*Simmons v. Enter. Holdings, Inc.*,
  2012 WL 2885919 ......................................................................................... 22, 23
  \
*Stainbrook v. Minnesota Dep't of Pub. Safety*,
  239 F. Supp. 3d 1123 (D. Minn. 2017) ....................................................... 12, 14

*Tussey v. ABB, Inc.*,
  850 F.3d 951 (8th Cir. 2017) ........................................................................ 21-22

*In re U.S. Bancorp Litig.*,
  291 F.3d 1035 (8th Cir. 2002) .......................................................................... 25

*Willix v. Healthfirst, Inc.*,
  2011 WL 754862 (E.D.N.Y. Feb. 18, 2011) ...................................................... 22

*Yarrington v. Solvay Pharmaceuticals, Inc.*,
  697 F. Supp. 2d 1057 (D. Minn. 2010) ......................................................... 25-26

**Statutes**

29 U.S.C. § 216 ................................................................................................ 9, 12, 24

29 U.S.C. §§ 201, *et seq.* ...................................................................................... 7, 8

**INTRODUCTION**

After over a year of negotiations, hard-fought litigation, and a recent second mediation, the parties have reached a fair and reasonable settlement. This settlement is structured as an FLSA collective action settlement, which contemplates issuance of a Court-approved notice to eligible collective members informing them of their legal rights and options under the settlement, followed by a settlement payment check the negotiation of which allows eligible employees to opt-in to the litigation and participate in the settlement in exchange for a release of claims.

The settlement provides for a $965,000.00 fund to pay the claims of up to approximately 1,800 eligible collective members, the costs of settlement administration, service enhancement payments, and agreed-upon reasonable attorney's fees and stipulated litigation costs.

As discussed below, the Court should approve all aspects of the parties' settlement. First, the Court should certify the case for settlement purposes as an FLSA collective action because the proposed settlement collective is comprised of employees the parties have stipulated are similarly situated for purposes of this settlement only. Second, the Court should find that the parties' settlement – negotiated at arm's length by experienced counsel with the assistance of a highly regarded wage-and-hour mediator – reflects a fair and equitable resolution of a bona fide dispute, in light of, among other things, the benefits accruing to members of the FLSA settlement collective, the substantial discovery conducted by the parties, and the complexity, risk, expense and possible length of time of continued litigation. Third, the Court should find that the settlement's proposed class representative and service payments are reasonable and warranted based on the additional consideration of the general release provided by the proposed recipients and the actions that these recipients took over the course of the negotiation and litigation to protect and advance the interests of others to whom a substantial benefit has been conferred under the settlement. Fourth, the Court should approve the parties' proposed notice and plan for distribution and settlement administration

as fair, adequate and reasonable for the settlement of an FLSA collective action. Finally, the Court should approve the parties' negotiated agreement that plaintiffs' counsel receive as a reasonable attorney's fee one-third (33.3%) of the maximum settlement fund recovered for the benefit of the FLSA settlement collective, plus reimbursement of their stipulated litigation costs.

## <u>PROCEDURAL HISTORY OF THE LITIGATION</u>

Plaintiff and seven additional opt-ins who were previously employed by Himagine Solutions, Inc. ("Himagine") as medical billing Remote Coders ("Coders"), all working from their respective homes, seek approval of this settlement agreement with Defendant Himagine to recover unpaid overtime compensation resulting from work they was performed "off-the-clock."    As remote workers, Plaintiffs and the opt-ins allege that Himagine precluded them from reporting all of their hours worked, requiring them to report a maximum of 40 hours per week unless they were given either an express mandate or authorization to work more than 40 hours.  ECF No. 1, ¶¶ 6-9. Plaintiff and the opt-ins allege that their performance quotas and other daily tasks assigned by Defendant required them to work more than 40 hours per week, and that Himagine's management was at all times aware that Coders regularly work overtime without proper compensation.  *Id.* Himagine ardently disputes the Plaintiff's and opt-ins' allegations, arguing that its policies and practices required the accurate reporting of hours by all employees, including Coders, that time records on which Coder pay is based are accurate, and that it at all times properly paid its Coders for all hours worked.  Quiles Dec. ¶ 8.

Plaintiff's counsel commenced its investigation of Himagine's potential FLSA violations as to the payment of Coders in July 2019.  Quiles Dec. ¶ 5.  On October 15, 2019, in an effort to explore a potential pre-litigation resolution of the Coders' claims, Plaintiff's Counsel sent a letter to Himagine inviting it to participate in class-wide settlement discussions. Quiles Dec. ¶ 5. The parties subsequently agreed to explore pre-suit mediation.  Quiles Dec. ¶ 5.  The parties then

2

confidentially exchanged hundreds of pages of information to allow them to make informed decisions as to the resolution of liability and damages, including handbooks, policies, time records, payroll data, detailed mediation briefs, and damage models. Quiles Dec. ¶ 6. On February 6, 2020, the parties attended a mediation conference in St. Louis, Missouri with experienced and respected wage and hour mediator Frank Neuner. Quiles Dec. ¶ 6. The parties mediated for a full day and continued settlement discussions following mediation, but were unable to reach a resolution. Quiles Dec. ¶ 6.

Plaintiff filed this action on April 23, 2020.[1] ECF No. 1. On July 21, 2020, this Court entered a Preliminary Case Management Order assigning this case to the complex track and setting forth a two-stage discovery plan whereby the parties would first conduct discovery as to FLSA conditional certification issues, followed by merits-based discovery pending the Court's ruling on conditional certification. ECF No. 24. The parties then engaged in the exchange of substantial information, including interrogatories and document requests propounded by both sides. Quiles Dec. ¶ 9. The parties exchanged thousands of pages of information including policies, handbooks, email communications, personnel files, payroll data, login data, time records, and other information pertinent to Plaintiff's and opt-ins' claims. Quiles Dec. ¶ 9. The parties scheduled Plaintiff, opt-ins, and Defendant's Rule 30(b)(6) witnesses for deposition. Quiles Dec. ¶ 9. After Defendant deposed Plaintiff and one opt-in plaintiff, the parties renewed their settlement discussions. Quiles Dec. ¶ 9. On October 1, 2020, the Parties requested that the deadlines set by

---

[1] Another plaintiff, Brian Hazel, filed a similar action at around the same time in the Superior Court of California for the County of Los Angeles, Case No. 20STCV17008, asserting unpaid overtime and other claims against Himagine under California law on behalf of a proposed class of Coders employed in California. That case is now pending in Alameda County, California. All wage and hour claims under California and federal law have been resolved as part of *Hazel v. Himagine Solutions, Inc.* in California and are pending court-approval in California state court. Hence, California Coders are not included as part of the settlement before this Court.

the Court in its Preliminary Case Management Order be stayed to allow them to schedule and focus efforts or resolving the claims at a second mediation conference. ECF No. 32. The Court granted the parties' request (ECF No. 33) and the parties mediated their claims on December 7, 2020, with another well-respected and experienced wage and hour mediator, Hon. Gail Andler, via Zoom video conference.[2] Quiles Dec. ¶ 10. Following a full day of mediation, the parties successfully resolved the claims pending in this case, and submitted notice of the resolution to the Court the following day. *See* ECF No. 34. Plaintiff hereby timely submits her unopposed motion to approve the settlement.

## SUMMARY OF SETTLEMENT TERMS

Under the proposed settlement, the parties propose that each FLSA Collective Member will receive a settlement check with the option to negotiate the check, thereby choosing to become a Participating Collective Member, opt-in to the settlement, and release their claims. *See* Exhibit 1, Settlement Agreement, Sections III.E.2., III.F.3.[3] Himagine will create a common settlement fund in the Maximum Settlement Amount of $965,000.00 which will include payments to the Participating Collective Members, class representative and service awards, attorneys' fees and expenses, and the cost of settlement administration. Settlement Agreement, Section II.O.

## I. Notice of Settlement and Calculation and Distribution of Settlement Shares

Upon approval, the parties propose sending a Notice of Settlement and Estimated Settlement Award ("Notice") in the form attached as Exhibit A to the Settlement Agreement. The Notice will inform Collective Members of the general terms of the settlement, their rights and obligations should they choose to participate in the settlement, the number of workweeks used to

---

[2] This mediation was an omnibus mediation of the claims in this litigation and the pending claims in *Hazel v. Himagine Solutions, Inc.* pending in California.

[3] Capitalized terms used herein shall have the same definition as described in the Settlement Agreement.

determine their specific share of the settlement amount, the estimated dollar amount of their settlement share, and instructions on how to dispute or correct the information on the settlement form. *See* Notice attached to Ex. 1 as exhibit A. Collective members will have 30 days in which to respond to the Notice with disputes or corrections. Ex. 1 at Section III.E.3. Collective Members need do nothing to receive a settlement check. Ex. 1 at Section III.E.2. At the conclusion of the 30-day period, and after the Settlement Administrator and the parties have resolved any disputes submitted by Collective Members, the Settlement Administrator will distribute checks for Settlement Shares to the Collective Members. Ex. 1 at Section III.E.5. Collective Members then have the option of negotiating their Settlement Share check, thereby consenting to opt in and participate in the settlement, becoming Participating Collective Members. Ex. 1 at Section III.F.3. Collective Members are not obligated to negotiate their Settlement Share checks and will not release any claims unless or until they do so. Ex. 1 at Section III.F.4. Collective Members will have 180 days in which to decide to participate in this settlement by negotiating their checks. Ex. 1 at Section III.E.6. At the conclusion of the check revocation period, uncashed funds will be returned to Himagine. Ex. 1 at Section III.F.6.

Each Collective Member's Settlement Share will be paid from the Net Settlement Amount, which is the amount of the settlement fund remaining after deductions for (a) the Class Representative Payment; (b) the Service Payments; (c) the Class Counsel Fees and Expenses Payment; and (d) the Settlement Administrator's fees and expenses. Ex. 1 at Sections II.P., III.B.1. The Settlement Administrator will calculate each Collective Member's Settlement Share based on the following formula:

> Each Collective Member will receive a payment equal to the Net Settlement Amount times the ratio of (i) the number of workweeks during which a Collective Member performed work for Himagine in a position covered by the Settlement

during the Covered Period ("Covered Workweeks") to (ii) the total number of Covered Workweeks worked by all Collective Members.

Ex. 1 at Section III.B.1.

Fifty percent of each Collective Member's Settlement Share will be reported as wages on an IRS Form W-2, and shall be paid net of all applicable employment taxes, including, without limitation, federal, state, and local income tax withholding and the employee share of the FICA tax. The other fifty percent of each Collective Member's Settlement Share will be reported as non-wages on an IRS Form 1099, and shall be pair without withholdings. Ex. 1 at Section III.B.2. Each Collective Member's Settlement Share shall be reported as earned in the year of payment to the IRS and applicable state and local taxing authorities. *Id.* The Settlement Administrator will be responsible for determining the appropriate number of exemptions to be used in calculating payroll taxes and withholdings, determining the appropriate tax rate, issuing Settlement Checks and IRS Forms W-2 and Forms 1099, and appropriately withholding and reporting payments to taxing authorities. Ex. 1 at Section III.D.

## II.    Class Representative Payment and Service Payments

In addition to their respective Settlement Shares detailed above, in exchange for general releases of all known and unknow claims against the Released Parties and to acknowledge their service to the Collective Members, the Named Plaintiff and opt-in plaintiffs will be eligible for additional payments. The Named Plaintiff will be eligible for a Class Representative Payment of $5,000.00. Ex. 1 at Section III.C.1. Opt-In Maria Santiago who participated in discovery and sat for deposition is eligible for a service payment of $2,500. Ex. 1 at Section III.C.2. The six other opt-in plaintiffs who participated in the discovery process and otherwise were instrumental in providing information leading to the settlement are eligible for payments of $500.00 each. *Id.* These enhancement payments total $10,500.00 for the eight eligible individuals. In exchange for

these payments, the individuals receiving a Class Representative Payment or Service Payment will provide a General Release of all claims against the Released Parties.   Ex. 1 at Sections III.F.1., III.F.2.   Thus, Settlement Collective Members who receive an enhancement award and who comply with the above will receive two checks: one will be the Settlement Share check calculated under the formula set forth above and the second will be the enhancement award check. *Id.*

## III.   Release

By signing, depositing, cashing, and/or negotiating the Settlement Share check, Collective Members who participate in the settlement will agree to opt-in to the Action and to release the Released Parties from all known and unknown claims up to and including the date on which the Court grants approval of the settlement, whichever is earlier, including but not limited to claims arising from allegations that Defendant failed to pay for all hours worked; failed to pay overtime wages; and failed to keep accurate records of all hours worked.  Ex. 1 at Section III.F.3.  The released claims include but are not limited to claims under the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201 et seq, and any similar federal, state, municipal or local laws. Such claims include claims for wages, statutory or civil penalties, liquidated damages, interest, other relief, and claims for attorneys' fees and costs.  *Id.*  This information will be detailed in the Notice.  Ex. 1 at Exhibit A.  The reverse side of each Settlement Share check, above the space for endorsement, will include the following language:

> **CONSENT TO JOIN AND FINAL RELEASE OF CLAIMS:**
>
> I understand that I have up to 180 days from the date I was mailed this Settlement Check to sign and cash this Settlement Check.
>
> By endorsing this check, I consent to join in the case entitled *Tyeasha Johnson v. Himagine Solutions, Inc.,* No. 20-cv-00574), now pending in the United States

District Court for the Eastern District of Missouri, and agree to be bound by the Settlement Agreement negotiated by Class Counsel in that case.

Ex. 1 at Section III.F.3.

If the Collective Member fails to sign or cash his/her Settlement Share check within the 180-day acceptance period of distribution, the uncashed check and the unclaimed funds shall revert to Himagine.  Ex. 1 at Section III.F.4.  Any Collective Member who does not timely sign or cash a Settlement Share check will not be bound by any release of claims.  *Id.*

Further, each individual receiving either a Class Representative Payment or a Service Payment must sign a general release in favor of Defendant.  Ex. 1 at Sections III.F.1., III.F.2.

## IV.    Attorneys' Fees and Costs

Under the terms of the Settlement Agreement, and subject to Court approval, Plaintiffs' Counsel seeks $321,666.67 in attorneys' fees, plus reimbursement of costs of $17,220.00 in out-of-pocket costs and expenses incurred in litigating and resolving this matter.  Ex. 1 at Section III.C.3.

## V.    Administration Costs

In addition, subject to the Court's approval, the fees and costs of the Settlement Administrator, Rust Consulting, Inc., in the amount not to exceed $30,000.00, will be paid from the Maximum Settlement Amount.  Ex. 1 at Section III.C.4.

## **ARGUMENT**

I.    **The Court Should Approve All Aspects of the Parties' Proposed FLSA Collective Action Settlement.**

Pending before the Court is Plaintiff's unopposed motion seeking an Order (1) certifying the case as an FLSA collective action for settlement purposes only; (2) approving the parties' FLSA settlement as a fair and equitable resolution of a bona fide dispute; (3) approving the settlement's proposed service enhancement payments as reasonable and warranted; (4) finding the parties' proposed Notice and plan for distribution and settlement administration to be fair, adequate and reasonable; and (5) approving the parties' negotiated agreement that plaintiffs' counsel receive as a reasonable attorney's fee of one-third (33.3%) of the common fund recovered for the benefit of the FLSA settlement collective, plus reimbursement of their stipulated litigation costs. For the reasons that follow, the motion should be GRANTED.

A.    **For Settlement Purposes, the Case Should be Certified as an FLSA Collective Action Because the Settlement Collective Is Comprised of Similarly Situated Employees.**

Although plaintiffs were in the midst of discovery in anticipation of filing their motion for conditional certification, no FLSA collective has yet been certified in this case. Accordingly, the parties now ask the Court to certify a collective action for settlement purposes only pursuant to 29 U.S.C. § 216(b). Certification of a collective action under § 216(b) allows for the issuance of a Court-approved notice to eligible collective members informing them of their legal rights and options under the settlement, including their ability to opt-in to the litigation and participate in the settlement in exchange for a release of claims.

Generally where, as here, parties settle FLSA claims before the court has made a final collective action ruling, the court makes some final certification finding as part of the approval of an FLSA collective action settlement. *See, e.g.*, *Sanderson v. Unilever Supply Chain, Inc.*, 2011 WL 5822413, at *2-3 (W.D. Mo. Nov. 16, 2011). In doing so, the court confirms that members of

9

the proposed settlement collective are "similarly situated" under § 216(b). *Id.* In making that determination, the court may consider several factors, including (1) the extent and consequences of disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to the defendant that appear to be individualized; and (3) other fairness and procedural considerations. *Id.*

Here, all Collective Members worked remotely performing similar work: Coding medical records for billing purposes. Quiles Dec. ¶ 7. They were subject to production quotas, and were responsible for accurately reporting their hours worked. Quiles Dec. ¶ 7. Collective Members were all subject to Defendant's timekeeping and reporting policies. Quiles Dec. ¶ 7. Collective Members who have opted into this case thus far allege that Himagine limited them to reporting only 40 hours per week, even if they worked more than 40 hours, unless they expressly received permission to report more hours or were required to work overtime. Quiles Dec. ¶ 7. Collective Members who have opted in thus far claim that Himagine managers were or should have been aware that they worked more than 40 hours per week without overtime compensation as required by the FLSA. Quiles Dec. ¶ 7.

Himagine alleges that Coders were paid for all hours worked, including all overtime worked. Quiles Dec. ¶ 8. Himagine asserts that its policies clearly forbid working off-the-clock and require Coders to accurately report all hours worked. Quiles Dec. ¶ 8. Himagine denies that its management limited Coders to reporting only 40 hours per week or were otherwise aware that Coders were working more hours than submitted on their time sheets. Quiles Dec. ¶ 8.

Thus, with respect to the claims and defenses at issue, members of the proposed settlement collective share common grievances capable of class-wide adjudication, which supports a finding that they are similarly situated for purposes of an FLSA collective action settlement. *See, e.g.*,

10

*Brown v. Reddy ICE Corp.*, 2016 WL 2930933, at *1-2 (E.D. Mo. May 19, 2016) (certifying two settlement classes of employees as an FLSA collective action because the classes "were subject to the same uniform policy or practice alleged to be unlawful under the FLSA, thus meeting the 'similarly situated' requirement for class certification) (citing *Kautsch v. Premier Commc'ns*, 504 F. Supp. 2d 685, 689 (W.D. Mo. 2007) (finding allegations that the class members performed essentially the same job and were paid using the same rate system were sufficient to certify the class)). *See also Astarita v. Menard, Inc.*, 2018 WL 7048693, at *1 (W.D. Mo. Dec. 7, 2018) ("A district court may certify a case as a collective action only if members of the class are 'similarly situated' or raise similar legal issues regarding coverage, exemption, or non-payment of wages.").

Finally, fairness and procedural consideration, including the number of similarly situated employees covered by the settlement collective (approximately 1,800) and the effectiveness of allowing them to join in the litigation to participate in a common settlement, also weigh in favor of collective action treatment. *See, e.g.*, *Brown*, 2016 WL 2930933, at *2 ("Additionally, taking into account other fairness and procedural considerations, certification would allow hundreds of employees to effectively pool their resources for litigation.") (citing *Shackleford v. Cargill Meat Solutions Corp.*, 2013 WL 209052, at *1-2 (W.D. Mo. Jan. 17, 2013) (certifying case as an FLSA collective action for settlement purposes where, inter alia, fairness and procedural considerations, including the number of plaintiffs and the effectiveness in joining them in the litigation, weighed in favor of collective treatment)).

Thus, the Court should find the proposed settlement collective is comprised of individuals that are "similarly situated" under § 216(b). Accordingly, the Court should certify this case for settlement purposes only as an FLSA collective action.

**B.    The Parties' FLSA Settlement Reflects a Fair and Equitable Resolution of a Bona Fide Dispute.**

It is well-established in the Eighth Circuit that a district court may approve an FLSA settlement upon a determination "that the litigation involves a bona fide dispute and that the proposed settlement is fair and equitable to all parties." *See, e.g.*, *Meller v. Bank of the West*, 2018 WL 5305562, at *8 (S.D. Iowa Sept. 10, 2018) (citing *Boland v. Baue Funeral Home Co.*, 2015 WL 7300507, at *2 (E.D. Mo. Nov. 18, 2015)); *Shackleford*, 2013 WL 209052, at *2 (same).[4]

### 1.    The Litigation Involves a Bona Fide Dispute.

"A settlement addresses a bona fide dispute when it reflects a reasonable compromise over issues that are actually in dispute." *Stainbrook v. Minnesota Dep't of Pub. Safety*, 239 F. Supp. 3d 1123, 1126 (D. Minn. 2017). *See also Shackleford*, 2013 WL 209052, at *2 ("If the settlement reflects a reasonable compromise over issues . . . that are actually in dispute, the Court may approve the settlement to promote the policy of encouraging settlement of litigation.").

In this case, the settlement agreement resolves a clear and actual dispute between the parties. Indeed, the proposed settlement is the product of an extensive settlement process and negotiation, which was preceded by a significant amount of discovery going to the merits of each party's claims and the propriety of certification.

---

[4]  The Eighth Circuit has noted the existence of a circuit split but has never taken a side on the issue of whether 29 U.S.C. § 216 actually requires judicial approval of all FLSA settlements. *See, e.g.*, *Barbee v. Big River Steel, LLC*, 927 F.3d 1024, 1026 (8th Cir. 2019) ("There is a circuit split on whether . . . to require judicial approval of all FLSA settlements. . . We have never taken a side on this issue. . . . [W]e need not decide our view on the circuit split today."). Generally, the accepted practice in this Circuit is to assume without deciding that the district court has a duty to exercise some level of review of any proposed FLSA settlement. *See, e.g.*, *Melgar v. OK Foods*, 902 F.3d 775, 779 (8th Cir. 2018) ("[W]e will assume without deciding that the district court has a duty to exercise some level of review of the [proposed FLSA Settlement] Agreement and the attorneys' fee award."); *Johnson v. Thomson Reuters*, 2019 WL 1254565, at *2 n.1 (D. Minn. Mar. 19, 2019) (noting that "[i]t is not entirely clear whether court approval is necessary," but proceeding to evaluate the parties' proposed FLSA collective action settlement to ensure it "is a fair and reasonable resolution of [a] bona fide dispute"); *Jones v. Synergies3 Tec Services*, 2018 WL 6727061, at *1-2 (E.D. Mo. Dec. 21, 2018) (same).

Here, Plaintiff asserts that Defendant failed to compensate them for all hours worked, requiring them to work "off-the-clock" and failing to compensate them for overtime work for hours over 40 in any workweek, in accordance with the FLSA.  ECF No. 1.  Defendant answered the Complaint and asserted affirmative defenses, disputing, among other things, collective treatment; Plaintiff's claim that Coders worked hours which they did not report or were not compensated; whether the alleged unpaid overtime was *de minimis*; the alleged amount of damages suffered by each Plaintiff; whether liquidated damages were appropriate; and the appropriate statute of limitations.  ECF No. 14.

Thereafter, the Parties engaged in extensive discovery, including depositions, and both interrogatories and the production of thousands of pages of documents and data, including policy documents, emails, personnel records, payroll data, training materials, schedules, and work logs. Quiles Dec. ¶ 9.[5] The Parties conferred extensively on discovery issues.  Quiles Dec. ¶ 9.  The Parties have also participated in two full day mediation sessions, the first one unsuccessfully in St. Louis, Missouri, and the second via Zoom video teleconference.  Quiles Dec. ¶¶ 6, 10. Thus, this Court should conclude that the threshold requirement of a bona fide dispute is easily established in this case.

### 2.    The Proposed Settlement Is Fair and Equitable.

In determining whether a proposed FLSA settlement is fair and equitable, the Eighth Circuit recently endorsed a "totality of the circumstances" approach, including the consideration of five factors that may be relevant to a district court's evaluation of an FLSA settlement.  *See*

---

[5] The parties also had preliminary discussions related to the production of Electronically Stored Information ("ESI").  Such data promised to be voluminous and costly in this case, as most all Coder work and communications with Coders was performed remotely though Himagine computer servers and Himagine's clients' servers.  This Settlement avoided this time consuming and costly production.

*Melgar*, 902 F.3d at 779 (citing with approval *Stainbrook*, 239 F. Supp. 3d at 1126 (identifying five of the many factors a district court may consider "[t]o determine whether settlement terms are fair and equitable to all parties"); *Carillo v. Dandan Inc.*, 51 F. Supp. 3d 124, 132-33 (D.D.C. 2014) (reviewing the "totality of the circumstances" when determining the fairness of an FLSA settlement)).

The five factors that courts typically consider in evaluating the fairness of an FLSA settlement include: "(1) the stage of the litigation and the amount of discovery exchanged, (2) the experience of counsel, (3) the probability of the plaintiff's success on the merits, (4) any overreaching by the employer in the settlement negotiations, and (5) whether the settlement is the product of arm's length negotiations between represented parties based on the merits of the case." *Stainbrook*, 239 F. Supp. 3d at 1126 (citing *King v. Raineri Constr., LLC*, 2015 WL 631253, at *2 (E.D. Mo. Feb. 12, 2015)). Generally, "[a] district court's review is properly limited to the terms precisely addressing the compromised monetary amounts that resolve the pending wage and overtime claims." *Id.* (citing *Carillo*, 51 F. Supp. 3d at 134).

First, the FLSA settlement before the Court is presumptively valid because it was negotiated at arm's length by experienced counsel with the assistance of a highly regarded wage-and-hour mediator (Hon. Gail Andler). *See, e.g.*, *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1148 (8th Cir. 1999) ("A strong public policy favors [settlement] agreements, and courts should approach them with a presumption in their favor."); *Meller*, 2018 WL 5305562, at *6 (holding that settlement was presumptively valid, given, among other things, "the arm's length negotiations supervised by experienced class action mediator" and "the substantial experience of both plaintiff and defense attorneys"); *King*, 2015 WL 631253, at *2-3 (stating in context of evaluating an FLSA

14

settlement that was the product of arm's length negotiation that "courts should be mindful of the strong presumption in favor of finding a settlement fair").

Next, a review of the other factors for evaluating an FLSA settlement all weigh in favor of a finding that the settlement here is fair and equitable.

The first factor, the state of the litigation and the discovery exchanged, favors approval. Here, prior to the lawsuit being filed, the parties exchanged hundreds of pages of documents and payroll data related to the merits and conditional certification issues in this case. Quiles Dec. ¶ 6. After the filing of this case, the parties commenced Phase I conditional certification discovery. Quiles Dec. ¶ 9. However, the parties agreed that, as to the Named Plaintiff and seven opt-ins at the time, discovery would include merits issues. Quiles Dec. ¶ 9. The parties then each propounded interrogatories and requests for production on the other and exchanged thousands of pages of Phase I discovery and merits-based discovery as to the Named Plaintiff and opt-ins to date. Quiles Dec. ¶¶ 9. The parties proceeded to schedule depositions of witnesses on both sides and completed the Named Plaintiff's deposition and an opt-in deposition prior to seeking a stay to allow the parties to mediate. Quiles Dec. ¶¶ 9-10. Defendant then provided Plaintiff with additional and more detailed data with which to prepare a damages model. Quiles Dec. ¶ 10. The total of the written information exchanged and testimony provided at the depositions afforded the parties with substantial information to analyze liability, determine potential damages, and assess risk as to the claims presented. Quiles Dec. ¶ 10. The substantial discovery exchanged in this case favors approval.

The next factor, the experience of counsel, also favors approval. This FLSA collective action had the benefit of attorneys on both sides who are highly experienced in complex litigation and familiar with the facts and law in the case, and who have negotiated settlements in other

15

complex litigation cases, including class and collective action settlements. Quiles Dec. ¶¶ 21-29. The Shavitz Law Group almost exclusively handles class and collective wage and hour cases across the United States and has regularly negotiates settlements in off-the-clock wage and hour cases like this one. Quiles Dec. ¶¶ 21-29. Similarly, Stueve Siegel Hanson LLP, also enjoy an excellent reputation for their skill and experience in handling class and collective wage an hour litigation.[6] Defense Counsel, Paul Hastings LLP, and specifically the attorneys handling this case, are very well experienced in handling class and collective action wage and hour litigation on behalf of employers nationwide. Quiles Dec. ¶¶ 29. The competence of counsel also demonstrates a lack of overreaching by the employer. The experience of Class Counsel and the extensive settlement discussions belie any suggestion that the settlement is the product of overreaching. As such, the experience of counsel representing the parties to this settlement, and the absence of any overreaching by the employer, favors the approval requested.

As to the final factor, the probability of success on the merits, Plaintiff remains steadfast about the validity and merits of the claims. However, Plaintiff acknowledges that risks remain regarding whether Plaintiff ultimately will prevail on those claims. Those risks include obtaining an order conditionally certifying the collective, maximizing participation following an order conditionally certifying the collective, defeating decertification motions, succeeding at the liability and damages phases of trial and post-trial motions, and succeeding on Defendant's inevitable appeal to the Eighth Circuit and beyond.

---

[6] *See, e.g., Garcia v. Tyson Foods, Inc.*, No. 06-2198-JTM, 2012 WL 5985561, at *4 (D. Kan. Nov. 29, 2012), *aff'd*, 770 F.3d 1300 (10th Cir. 2014) (following a successful donning and doffing verdict on behalf of a class and collective of employees at a Kansas meatpacking plant (which was affirmed on appeal), Judge Marten of the District of Kansas noted regarding Stueve Siegel Hanson that "it appears that plaintiffs' counsel's experience in wage-hour class actions has unmatched depth.").

There was a risk that the Court would deny conditional certification, as Defendant focused on individual differences amount opt-ins during Phase I discovery.  Quiles Dec. ¶ 15.  While Plaintiff is confident she would have easily satisfied the relatively low burden for conditional certification, the risk that such relief could have been denied exists.  Quiles Dec. ¶ 15.  Of course, the greater risk would have existed after Phase II when Himagine inevitably would have filed a motion to decertify the collective.  Quiles Dec. ¶ 15.  Coders worked from home and, with some constraints, were largely able to set their own schedules.  Quiles Dec. ¶ 15.  Coders primarily worked for a single Himagine client at any given time.  Quiles Dec. ¶ 15.  Himagine asserts that the customer's specific contract, demands, and electronic medical record systems directly impacted how Coders performed their work and the method by which their coding time was recorded.  Quiles Dec. ¶ 15.  Himagine also asserted that Coders worked for different managers, and that any allegation that managers instructed them to work off the clock would be individualized and contrary to company-wide policy.  Quiles Dec. ¶ 15.  Himagine also asserted that Coders worked for different managers, and that any allegation that managers instructed them to work off the clock would be individualized and contrary to company-wide policy.  Quiles Dec. ¶ 15.

If the opt-in were to defeat Himagine's attempts at decertification, trial of the case on behalf of Coders also presented risks and challenges.  Even if Plaintiffs brought Opt-in Plaintiffs from various states to testify at the liability phase of trial, they still faced many risks associated with various defenses raised by Himagine. For example, Himagine would have argued that these witnesses cannot be representative of the experiences of hundreds of other opt-in plaintiffs who worked from their homes at different locations across the country, working their own schedules, coding for different customers, reporting to different managers, and at different times during the recovery period.  Quiles Dec. ¶ 16.  Additionally, Defendant would have again raised all of its

17

defenses, including that the Coders were responsible for reporting their own time and that the company maintained and enforced a policy requiring Coders to report and verify all time worked, among others. Quiles Dec. ¶ 16. Defendant contends that its witnesses, company policies, data, and documents, all support the fact that Coders did not work off the clock and were properly compensated under the FLSA. Quiles Dec. ¶ 16. Defendant also would have raised its due process arguments (as it would have at the decertification stage as well) arguing against the propriety of representative testimony and claiming it violates Defendant's due process rights because of the individualized nature of the claims and its defenses. Quiles Dec. ¶ 16. If Plaintiffs succeeded at the liability phase, at the damages phase, Defendant would have raised arguments about individualized proof of damages. Quiles Dec. ¶ 16. Defendant would have argued that it paid Coders in good faith, thereby precluding any recovery of liquidated damages and a third year of liability. Quiles Dec. ¶ 16.

Nonetheless, Plaintiff would have argued that she should prevail on the merits of these claim that Coders were not compensated for overtime worked off-the-clock, as she contends that evidence would demonstrate that so much of Coders' time was spent performing actual coding work to meet quotas, that their other duties and tasks, such as checking email, reviewing their work for errors, logging in to the various computer systems needed to perform coding, had to be performed off the clock. Quiles Dec. ¶ 17. Plaintiff would point to Himagine policies requiring plaintiffs to perform coding work for eight hours a day, meaning other work-related tasks were in addition to the eight-hour day. Quiles Dec. ¶ 17.

Even if Plaintiff and the collective were to prevail at conditional certification, decertification, and trial, the prospect of Defendant prevailing on appeal would loom large. It is

likely that Defendant would have appealed any adverse decertification rulings and trial rulings and findings.

This nearly one-million-dollar settlement avoids all of these risks and provides meaningful relief to workers at a time when many Americans are suffering due to a pandemic. Payroll data indicates that Coders only reported working 40 or more hours per week in 57% of the weeks worked. Quiles Dec. ¶ 20. Based on weeks in which Coders reported working 40 hours or more, this settlement represents payment of approximately $22.25 per week which, based on the average hourly wage for coding activities of $29.05, represents more than a half hour of overtime every week in which their off the clock work may have resulted in unpaid overtime.[7] Quiles Dec. ¶ 20. Plaintiffs' Counsel believes this is an excellent result based on the amount of unpaid overtime sought in this case and all of the risk factors described above. Quiles Dec. ¶ 20. This settlement is fair, equitable, and eminently reasonable. It should be approved because it reflects a fair and equitable resolution of a bona fide dispute.

### C.    The Proposed Class Representative and Service Payments Are Reasonable and Warranted.

The parties' Settlement Agreement contemplates a Class Representative Payment of $5,000 to the Named Plaintiff, a Service Payment of $2,500 to one deposed opt-in plaintiff, and Service Payments of $500 each to opt-in plaintiffs who participated in Phase I discovery and assisted Class Counsel with preparation for the mediation conferences. Ex. 1 at Sections II.C.1.m III.C.2. Recipients of these service enhancement payments will provide the Released Parties a

---

[7] Payroll data indicates that of the approximate total 74,000 weeks in an almost three-year period, Coders only reported 40 or more hours worked, thereby triggering overtime damages, in approximately 43,000sersdf weeks. As the Covered Period in the Settlement is dependent, in part, on the date of any Court order approving the Settlement, Plaintiff estimates the payment amounts based on extrapolating data provided by Defendant. *See* Ex. 1 Section II.G. (defining "Covered Period").

general release of claims, which exceeds the scope of the release being provided by Participating Collective Members.  Ex. 1 at Sections III.F.1., III.F.2.  The Court should approve these proposed service enhancement payments because they are reasonable and warranted based on the actions these dedicated plaintiffs took over the course of this litigation to protect and advance the interests of other similarly situated employees to whom a substantial benefit has been conferred under this settlement. *See Caligiuri v. Symantec Corp.*, 855 F.3d 860, 867-68 (8th Cir. 2017) (stating that the relevant factors for deciding whether service awards are warranted include "(1) actions the plaintiffs took to protect the class's interests, (2) the degree to which the class has benefitted from those actions, and (3) the amount of time and effort the plaintiffs expended in pursuing litigation").

The Named Plaintiff for whom a $5,000 service enhancement payment is requested actively participated and assisted counsel in all phases of this litigation. This included working with counsel during the initial case investigation phase, pre-suit mediation, and the preparation of the original Complaint.  Quiles Dec. ¶ 18.  She also assisted with initial Rule 26 disclosures, responses to written discovery, the production of documents, and deposition discovery. Quiles Dec. ¶ 18.  With respect to case resolution, the Named Plaintiff was available during mediation and routinely communicated with counsel with respect to the settlement of the case.  Quiles Dec. ¶ 18.  The Named Plaintiff also took a "reputational risk"[8] by attaching her name to litigation against a former employer and could be subject to difficulty securing employment with future employers that learn of her involvement in such litigation.

---

[8]  *See Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 267 (N.D. Cal. 2015) ("Incentive awards are particularly appropriate in wage-and-hour actions where plaintiffs undertake a significant 'reputational risk' by bringing suit against their former employer.") (approving incentive award of $10,000 to named plaintiff, plus additional $5,000 for broader release of claims).

The opt-in plaintiff for whom a $2,500 Service Payment is requested also assisted in the advancement of the plaintiffs' claims by participating in the exchange of written discovery and preparing with counsel and appearing for a deposition during phase 1 discovery. Quiles Dec. ¶ 19. She also assisted in the preparations for mediation. Quiles Dec. ¶ 19. This opt-in plaintiff also took a risk by opting in prior to certification and actively participating in litigation against their former employer.

The opt-in plaintiffs for whom a $500 Service Payment is requested also assisted in the advancement of the plaintiffs' claims by participating in the exchange of written discovery, and many of them provided information to Class Counsel in the course of preparing for depositions that were postponed once this case was stayed pending the second mediation conference. Quiles Dec. ¶ 19. They provided Class Counsel with vital information in advance of the mediation conference. Quiles Dec. ¶ 19.

Many courts have recognized that the risk, time and dedication that an individual devotes to a representative lawsuit inures to the common benefit of others and warrants a service enhancement payment above-and-beyond what other class members receive in the settlement. *See, e.g.*, *Caligiuri*, 855 F.3d at 867-68 ("Courts often grant service awards to named plaintiffs in class action suits to promote the public policy of encouraging individuals to undertake the responsibility of representative lawsuits.") (affirming service awards of $10,000 to each of the two named plaintiffs and noting that "courts in this circuit regularly grant service awards of $10,000 or greater"); *Tussey v. ABB, Inc.*, 850 F.3d 951, 961-62 (8th Cir. 2017) (affirming incentive awards of $25,000 to each of the three named plaintiffs as compensation for their work and the benefit they conferred on the rest of the class); *Matheson v. T-Bone Rest.*, LLC, 2011 WL 6268216, at *9 (S.D.N.Y. Dec. 13, 2011) (approving $45,000 service award to named plaintiff in wage-and-hour

settlement after 2½ years of litigation); *Willix v. Healthfirst, Inc.*, 2011 WL 754862, at *7 (E.D.N.Y. Feb. 18, 2011) (approving $30,000 service award to named plaintiff in FLSA settlement after 3 years of litigation).

The modest service awards requested here, in light of the involvement by the Plaintiff and opt-ins and the result obtained, are certainly within the range of reasonable enhancement awards routinely granted.

Accordingly, the Court should approve the proposed service enhancement payments.

**D.    The Parties' Proposed Notice and Plan for Distribution and Settlement Administration Are Fair, Adequate and Reasonable.**

The parties' Settlement Agreement also contains a proposed Notice to eligible collective members, along with a plan for distribution of Settlement Share checks to all Collective Members, and a plan for settlement administration.  Ex. 1 at Sections III.E., III.F.

Courts routinely approve FLSA settlement notices that fairly and accurately inform collective members of their legal rights and options under the settlement. *See, e.g.*, *Hill v. World Wide Tech. Holding Co.*, 2012 WL 5285927, at *2 (E.D. Mo. Oct. 25, 2012) ("Further, the form of notice is fair and accurate, and reasonably advises class members of the terms of the settlement and their options with regard to the settlement."); *Simmons v. Enter. Holdings, Inc.*, 2012 WL 2885919, at *1 (E.D. Mo. July work13, 2012) (approving FLSA settlement notice that informed collective members of their rights under the settlement, including "the estimated amount of their respective shares of the settlement fund").

    The Notice here clearly and concisely states in plain, easily understood language eligible Collective Member's legal rights and options under the Settlement Agreement. *See* Ex. 1 at Exhibit A.  The Notice advises Collective Members of the estimated amount of their individual Settlement Share and the number of workweeks used to calculate their payments.  *Id.*    The Notice also

provides them instructions on how to update or correct their contact information or dispute the calculation of their Settlement Share. *Id.* The Notice also explains that the Notice will be followed by a Settlement Share check, and that Collective Members may participate in the settlement and opt into this case by cashing the Settlement Share check, thereby releasing their wage and hour claims against Himagine. *Id.* Alternatively, the Notice explains that Collective Members who do not timely sign or negotiate their Settlement Share check will not be subject to the judgment in this case, and the lawsuit and settlement will have no effect on them. *Id.*

In terms of the issuance of Notice, the Settlement Agreement requires the Settlement Administrator to send the Notice to Collective Members via first class U.S. Mail to their last known address. Ex. 1 Section III.E.2. For any Notice returned as "undeliverable," the Settlement Administrator is required to forward it to any forwarding address provided by the U.S. postal service. *Id.* If no such forwarding address is provided, the Settlement Administrator is required to perform a skip trace to attempt to obtain the most recent address for such person. *Id.*

The Settlement Agreement provides for a period of 30 days during which Collective Members can review the Notice and return any corrections or disputes as to their Settlement Share. III.E.3. There is also a process for the Settlement Administrator's handling of disputes submitted by Collective Members. *Id.*

Settlement checks are to be mailed within 20 days after the end of the Notice Review Period, and can be presented for payment for 180 days. Ex. 1 Sections III.E.5., III.E.6. After that, the funds for any Settlement Share checks not presented for payment will revert to Himagine. IIII.E.6.

Overall, the parties' proposed Notice and plan for distribution and settlement administration include content and utilize a process generally accepted as fair, reasonable and

adequate for settlement of an FLSA collective action. Accordingly, the Court should approve the parties' proposal.

**E.    The Court Should Approve the Parties' Negotiated Agreement that Plaintiffs' Counsel Receive as a Reasonable Attorney's Fee One-Third (33.3%) of the Common Fund Recovered for the Benefit of the FLSA Settlement Collective, Plus Reimbursement of Their Stipulated Litigation Costs.**

As part of the FLSA collective settlement in this case, the parties agreed that plaintiffs would seek the Court's approval of an award of $321,666.67 in reasonable attorney's fees – calculated as one-third (33.3%) of the settlement's $965,000.00 common fund, plus reimbursement of their stipulated litigation costs of $17,220.00.

The FLSA includes a mandatory attorney's fee shift provision in favor of prevailing plaintiffs, along with recovery of litigation costs. 29 U.S.C. § 216(b) ("The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action.").

Generally, "[t]he amount of the fee . . . must be determined on the facts of each case," and "[i]t remains for the district court to determine what fee is 'reasonable.'" *Hensley v. Eckerhart*, 461 U.S. 424, 429, 433 (1983).[9]

**1.    A Reasonable Attorney's Fees Using the "Percentage of the Benefit" Approach.**

Where, as here, a common fund is created by settlement of a collective action, it is well-established for a court to award attorney's fees as a percentage of the fund. *See, e.g.*, *Huyer v. Buckley*, 849 F.3d 395, 398 (8th Cir. 2017) ("[T]he 'percentage of the benefit' approach permits

---

[9] In June 2019, the Eighth Circuit ruled that the FLSA does not require judicial approval of settled attorney's fees in the context of an individual FLSA settlement where the attorney's fees were negotiated separately and without regard to the plaintiff's FLSA claim. *Barbee*, 927 F.3d 1024, 1026. The Eighth Circuit's ruling in *Barbee* would likely not extend to the present case because the Settlement Agreement here is for the benefit of an FLSA collective and contemplates an award of attorney's fees using the "percentage of the benefit" approach.

an award of fees that is equal to some fraction of the common fund that the attorneys were successful in gathering during the course of the litigation.").

Using this "percentage of the benefit" approach, courts in the Eighth Circuit routinely award plaintiffs' counsel between 25% and 36% of a settlement's common fund as the appropriate measure of a reasonable attorney's fee, plus reimbursement of litigation expenses[10] from the fund. *See, e.g.*, *Caligiuri*, 855 F.3d at 865-66 (affirming award of attorney's fees calculated as one-third of the total settlement fund, plus reimbursement of litigation expenses from the fund); *Meller*, 2018 WL 5305562, at *9 (awarding 33.3% of the settlement's maximum settlement amount under the "percentage of the benefit" approach, plus reimbursement of litigation expenses from the fund) (citing *Huyer*, 849 F.3d at 399-400 (finding an award of one-third of the settlement fund to be reasonable and fair); *In re U.S. Bancorp Litig.*, 291 F.3d 1035, 1038 (8th Cir. 2002) (concluding that a district court's attorney fee award of 36% of a class action settlement fund was not an abuse of discretion); *Yarrington v. Solvay Pharmaceuticals, Inc.*, 697 F. Supp. 2d 1057, 1061 (D. Minn. 2010) (finding that an award of 36% of a class action settlement was "in line with the range of fees approved by the Eighth Circuit"); *In re Excel Energy, Inc., Sec., Derivative & ERISA Litig.*, 364 F. Supp. 2d 980, 998 (D. Minn. 2005) (surveying eleven cases in the courts in the Eighth Circuit

---

[10] The stipulated litigation costs of $17,220.00 for which plaintiffs' counsel seeks reimbursement – (*see* Quiles Dec. ¶ 35), are reasonable and are of the kind and character typically reimbursed from a settlement fund. *See, e.g.*, *Netzel v. West Shore Group, Inc.*, 2017 WL 1906955, at *9 (D. Minn. May 8, 2017) (explaining that, consistent with Supreme Court and Eighth Circuit precedent, courts routinely approve reimbursement of expenses from a settlement fund for such things as "travel, meals, lodging, photocopying, long-distance telephone calls, computer legal research, postage, courier service, mediation, exhibits, document scanning, and visual equipment"); *Matheson*, 2011 WL 6268216, at *9 (awarding class counsel their litigation costs to be paid from the settlement fund, including expenses associated with "mediator's fees, expert fees, consultant fees, process server charges, telephone charges, postage, transportation and working meal costs, photocopies, and electronic research" because such expenses "are reasonable and were incidental and necessary to the representation of the class").

including one fee award of 36%, seven of 33.3%, two of 30%, and one of 25%)); *Barfield v. Sho-Me Power Elec. Co-op.*, 2015 WL 3460346, at *4 (W.D. Mo. June 1, 2015) (awarding one-third of common fund as reasonable attorney's fees); *Shackleford v. Cargill Meat Sols. Corp.*, 2013 WL 937550, at *2 (W.D. Mo. Mar. 8, 2013) ("a counsel fee of 33.3% of the common fund is comfortably within the range typically charged as a contingency fee by plaintiffs' lawyers in an FLSA action"); *Sanderson v. Unilever Supply Chain, Inc.*, 2011 WL 6369395, at *2 (W.D. Mo. Dec. 19, 2011) (awarding 33.78% of the settlement fund as reasonable attorney's fees).

The Eighth Circuit also recently admonished district courts to afford "a certain level of deference" when reviewing the amount of attorney's fees that a defendant agrees to pay in an FLSA settlement. *Melgar v. OK Foods*, 902 F.3d 775, 779 (8th Cir. 2018) ("[R]eview of attorneys' fees included in a settlement agreement requires a certain level of deference by the district court to the parties' agreement."). As the Eighth Circuit explained, "any process of reviewing and approving stipulated attorneys' fees in the event of a settlement is more deferential than resolving attorneys' fees in a disputed case." *Id.* at 780 (citing *Hensley*, 461 U.S. at 437 (As the Supreme Court noted, "Ideally, of course, litigants will settle the amount of a fee" and "[a] request for attorney's fees should not result in a second major litigation.")).

In *Melgar*, the Eighth Circuit reversed the district court's reduction to the parties' agreed-upon attorney's fees as part of an FLSA settlement; finding that "the district court's approach extended beyond the scrutiny the situation required." *Id.* at 779. The Eighth Circuit noted that the terms of the parties' settlement appeared fair and reasonable. As such, the Court explained that "any required review by the district court [of the agreed-upon attorney's fees] is light" and should receive court approval as long as "the award is not outside the range of what would be approved." *Id.* The Eighth Circuit ultimately remanded the case to the district court with instructions to award

plaintiffs' counsel the full amount of attorney's fees the parties had agreed to as part of their FLSA settlement. *Id.* at 780.

In this case, the parties agreed as part of their settlement that plaintiffs would seek the Court's approval of an award of $321,666.67 in reasonable attorney's fees – calculated as one-third (33.3%) of the settlement's $965,000.00 common fund, plus reimbursement of stipulated litigation costs of $17,220.00. Consistent with established case law from the Eighth Circuit and district courts identified above, this Court should approve the parties' negotiated agreement on the award of reasonable attorney's fees and reimbursement of litigation costs. Under the parties' Settlement Agreement, attorney's fees are calculated under the well-established "percentage of the benefit" approach using a percentage (33%) that is comfortably within the range (25% to 36%) of what is frequently approved in the Eighth Circuit and this district.

## 2. Other Relevant Factors Support the Award of Attorney's Fees.

In a common fund situation, courts often refer to the following factors as support for the decision to award the requested fee: "(1) the amount involved and the results obtained; (2) whether the fee is fixed or contingent; (3) the novelty and difficulty of the questions; (4) the experience, reputation and ability of the attorneys; and (5) awards in similar cases." *See, e.g.*, *Keil v. Lopez*, 862 F.3d 685, 702 (8th Cir. 2017).

These factors support the award of attorney's fees in this case. The award of attorney's fees is reasonable given plaintiffs' counsel's ability to successfully obtain a concrete and substantial benefit – a settlement fund totaling $965,000.00 – for a collective of approximately 1,800 similarly situated employees with relatively low dollar claims.

The experience, reputation and the ability of plaintiffs' counsel also support the fee request. *See*, *e.g. Halleen v Belk*, No. 4:16-CV-00055-ALM, 2018 U.S. Dist. LEXIS 214015, *15 (E.D. Tex. Dec. 20, 2018) (finding Shavitz Law Group to be experienced labor and employment

attorneys who are well-versed in litigating complex FLSA collective actions); *Garcia v. Tyson Foods, Inc.*, 2012 WL 5985561, at \*4 (D. Kan. Nov. 29, 2012), *aff'd* 770 F.3d 1300 (10th Cir. 2014) (noting, in the context of a contested FLSA fee application, co-counsel, George Hanson's "experience in wage-hour class actions has unmatched depth" and "provided the plaintiffs in this action a great benefit in both effectiveness and efficiency.").

In this case, plaintiffs' counsel leveraged this experience for the benefit of the collective during contentious phase one discovery and multiple mediation conferences. Plaintiffs' counsel engaged in lengthy settlement negotiations to achieve this agreement, which was preceded by an extensive period of investigation, legal research and analysis of difficult legal questions and theories, and discovery directed at the parties' claims and defenses and the likelihood of certification. Quiles Dec. ¶ 30. Plaintiffs' counsel also took the case on a contingency fee basis with no guarantee of success, with the real risk and possibility of no recovery and no fee of any kind. Quiles Dec. ¶ 31. Plaintiffs and their counsel faced significant risks in the litigation and would have had to overcome a number of hurdles to receive any recovery had the case proceeded forward. Quiles Dec. ¶ 31. Thus, these additional considerations support the reasonableness of the requested fee award.

### 3. A Lodestar Cross-Check Here Results in a "Negative Multiplier" Supporting the Award of Attorney's Fees.

Finally, although not required, cross-checking the attorney's fee request against the lodestar in this case also demonstrates its reasonableness. *See Keil*, 862 F.3d at 701 ("Although not required to do so, the court verified the reasonableness of its [percentage of the benefit] award by cross-checking it against the lodestar method."). Here, plaintiffs' counsel documented a lodestar of $379,213.00. Quiles Dec. ¶ 33. Plaintiff's Counsel's lodestar will continue to increase, as counsel continues its efforts to obtain approval of the settlement, oversee the administration of the

settlement, communicate with Collective Members about the settlement, and perform all continuing obligations as outlined in the Settlement Agreement. Quiles Dec. ¶ 34. The request for attorney's fees of $321,666.67 produces a lodestar that is less than the fee a requested – a "negative multiplier." This is certainly reasonable as cross checks resulting in fee multipliers are regularly approved in the Eighth Circuit. *See, e.g., Keil*, 862 F.3d at 701-03 (affirming lodestar cross-check multiplier of 2.7 as reasonable and towards the low end of the range of multipliers approved in other cases); *Caligiuri*, 855 F.3d at 866 (recognizing in context of a lodestar cross-check that cases within the Eighth Circuit have approved multipliers of up to 5.6); *Huyer*, 849 F.3d at 399 (noting that lodestar multipliers of 2.5 to 5.6 have been approved within the Eighth Circuit); *Nelson v. Wal-Mart Stores, Inc.*, 2009 WL 2486888, at *2 (E.D. Ark. Aug. 12, 2009) (approving multiplier of 2.5 as reasonable in light of other fee awards by courts in the Eighth Circuit approving multipliers of up to 5.6). As such, the lodestar cross check further supports the reasonableness of the attorney's fees requested in this case.

Accordingly, plaintiffs respectfully request the Court's approval of an award of reasonable attorney's fees in the amount of $321,666.67, plus reimbursement of their stipulated litigation costs in the amount of $17,220.00.

## CONCLUSION

WHEREFORE, plaintiffs respectfully request that the Court grant Plaintiffs' Unopposed Motion for Approval of FLSA Collective Action Settlement and Award of Attorney's Fees. For the convenience of the Court, a proposed Final Order and Judgment is attached hereto as Exhibit B to Exhibit 1.

## CERTIFICATE OF SERVICE

I hereby certify that on January 21, 2021, a true and correct copy of the foregoing document was filed electronically through the Court's CM/ECF system, and therefore, will be transmitted to all counsel of record by operation of the Court's CM/ECF system.

By:     /s/ Alan L. Quiles_____
ATTORNEY FOR PLAINTIFF